IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

G4I CONSULTING, INC.,            )
                                 )
          Plaintiff              )
                                 )
     v.                          )          1:11cv810  (LMB/TCB)
                                 )
NANA SERVICES, LLC,              )
                                 )
          Defendant.             )

FILED

MAY 1 4 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### MEMORANDUM OPINION

The parties to this breach of contract dispute have filed
cross-motions for summary judgment on all three counts in the
complaint. The motions have been briefed and argued. For the
reasons discussed in court and articulated below, the motions
will be granted in part and denied in part.

### I.    BACKGROUND

Plaintiff G4i Consulting, Inc. ("G4i" or "plaintiff") is a
Virginia corporation that analyzes the suitability of requests
for proposals ("RFPs") on behalf of its clients, helps them
secure contracts with prime contractors and the federal
government, manages bid proposals, and determines the costs a
client may expect to incur in performance of a contract. See
Compl. ¶¶ 7-8; Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Br."), Ex.
1, Christopher Stahl Aff. ¶¶ 6-7. Defendant NANA Services, LLC
("NANA" or "defendant"), a wholly-owned subsidiary of Alaska

Native Corporation Akmaaq LLC, is a limited liability corporation organized under Alaska law. See Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Br.") at 4. NANA provides its clients, which are principally prime contractors with federal government contracts, with operations support, such as facility and labor management. See Def.'s Br. at 4; Pl.'s Br. at 2.

On August 25, 2006, the parties executed a "Services Agreement," which was the underlying contract governing the parties' relationship, and the Raytheon Polar Services Company "Sales Referral Agreement" (hereinafter, the "Raytheon Sales Agreement"), which was the first of a dozen such project-specific Sales Referral Agreements between NANA and G4i. See Pl.'s Br., Exs. 8, 12. Both agreements were drafted by G4i. According to the scope of work outlined in the Services Agreement, G4i was retained to advise NANA on the "Federal Government contract environment," analyze NANA's business in order to help NANA position itself to secure contracts, assist in the preparation of bids, and foster NANA's relationships with other contractors so that NANA might obtain new business. See Pl.'s Br., Ex. 8 at 1-2; see also Compl. ¶¶ 9-10 (alleging that G4i was hired to provide a "complete outsourced marketing department to NANA" and to "provid[e] every aspect of business development").

2

Under the Services Agreement, G4i was entitled to a $5,000 monthly retainer; one percent of all gross revenues from any contract and its option years, which NANA received "as a result of a Bid or Proposal where" the parties "have jointly executed a Sales Referral Agreement" and "where G4i assisted in any form to help [NANA] receive the contract award"; one percent of all gross receipts received by NANA "as a result of any relationship obtained by" NANA due to G4i's efforts in introducing the relationship;[1] and the payment of G4i's "normal day rates" where NANA uses plaintiff's "Bid and Proposal services." See Pl.'s Br., Ex. 8 ¶¶ 3.1 (retainer), 3.2 and 3.6 (one-percent provisions), and 3.7 ("day rates"). Plaintiff would also be reimbursed for certain incurred expenses. See id. ¶ 3.3.

In addition to the compensation terms, the Services Agreement provided that Alaska law would govern any dispute, id. ¶ 18.1, and that G4i would be an independent contractor, not NANA's agent or representative, id. ¶ 1.3. It required G4i to use its best efforts, but NANA acknowledged that success could not be guaranteed. See id. ¶ 5.1(e). Any contract modification had to be in writing, id. ¶ 11.2, and all prior agreements were extinguished through a merger clause, id. ¶ 11.1. Furthermore, the Services Agreement specified that a non-breaching party

---

[1] It is undisputed that G4i is not entitled to recover on this provision.

3

could terminate only upon 30 days written notice to the
breaching party and only if the breaching party did not cure.
Id. ¶ 2.3. Signed by G4i's president, Christopher Stahl
("Stahl"), and NANA's CFO, Thomas Beard ("Beard"), the Services
Agreement was to last one year unless extended. Id. ¶ 2.1. On
August 2, 2007, the contract was extended for an additional
year, to August 6, 2008. See Pl.'s Br., Ex. 10.

When the parties began contracting, NANA was already
performing work for Raytheon Polar Services Corporation
("Raytheon") in Antarctica, where it helped manage some Raytheon
worksites. In an email dated August 11, 2006, Raytheon indicated
to NANA that it was interested in a new contract that would
include staffing services for those worksites as well as the
management that NANA had previously been doing (hereinafter, the
"Raytheon Polar contract"). See Def.'s Br. at 5-6, Ex. 6. On
August 18, 2006, Raytheon formally issued a sole-source bid
request to NANA. NANA president Steve Cammack ("Cammack")
retained G4i to "provide technical assistance on an (sic) marked
up hourly/daily basis" in connection with obtaining the new
Raytheon business. See Def.'s Br., Ex. 6 (email to Beard and
NANA vice president Daniel Javes). On August 25, 2006, the
parties signed the Raytheon Sales Agreement, engaging G4i to
assist in the creation of a proposal and to complete the

4

proposal's cost section in response to the RFP, which called for a "Budgetary Cost Estimate to recruit, train (if applicable), and manage all employees supporting specific Station services." See Pl.'s Br., Ex. 12. Under the Raytheon Sales Agreement, G4i was entitled to a fee of $125 per hour, not to exceed a total of $15,000, for its work assisting NANA in securing the Raytheon Polar contract. Id. Additionally, NANA agreed to "pay G4i one percent (1.0%) of all gross receipts received by [NANA] as a result of a contract obtained by [NANA] due to the efforts of G4i in relation to the Engagement specified above." Id.

It is undisputed that G4i worked on the proposal under the Raytheon Sales Agreement. The initial proposal was submitted to Raytheon on September 8, 2006, at which point Raytheon "rais[ed] questions about cost." See Def.'s Br. at 7. Revised proposals were submitted on November 14, 2006 and again on February 9, 2007. Id. Raytheon did not accept these proposals, instead issuing a new RFP on April 4, 2007, again as a sole-source solicitation to NANA. See Def.'s Br. at 8; Pl.'s Br., Ex. 23 (email from Javes to G4i forwarding the revised RFP accompanied by message, "Not much time gents."). Around the same time, Raytheon sent NANA a description of its "burdened labor structure" and advised it of the rates that Raytheon's own client, the National Science Foundation ("NSF"), would accept.

See Def.'s Br. at 8, Ex. 17. Based on these new rates, NANA
resubmitted its response on April 25, 2007 and was awarded the
Raytheon Polar contract. Id. Although the parties disagree about
the quality and value of G4i's performance in connection with
NANA obtaining the contract, it is undisputed that G4i was
involved in drafting every version of the proposal that NANA
submitted to Raytheon. Compare Def.'s Br. at 6-8 (arguing that
G4i relied on a "boilerplate" template; implying G4i mishandled
the costing; stating that CFO was "pretty frustrated") with
Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n.") at 3-4 (citing
Cammack testimony indicating "G4i put this entire thing
together" and that Raytheon was "moving the ball" on cost and
citing Raytheon email seeking clarification, not criticizing)
and Def.'s Reply Mem. Supp. Mot. Summ. J. ("Def.'s Reply") at 5-
6 (identifying in ¶ 10 the undisputed facts with respect to
G4i's RFP involvement).

During 2007 and early 2008, the parties extended the
Services Agreement and entered into several additional Sales
Referral Agreements. On February 15, 2008, Jonathan Widdis
("Widdis"), the president of NANA's parent company Akmaaq,
expressed concern to Cammack about the more than $800,000 that
NANA had paid to date to G4i and the parties' one percent gross
revenue deal. Widdis indicated that if NANA could not legally

6

get out of the one percent fee provision, it might have to decline any new business that would fall under the G4i contracts. See Pl.'s Br., Ex. 61 (Widdis email). Following Widdis' instruction, Cammack emailed G4i a stop work notice just after 11:30 p.m. on February 19, 2008. Specifically, Cammack ordered G4i to "stand[] down . . . on any further costs . . . unless authorized in advance," although he expressed the opinion that this would be settled soon. See Pl.'s Br., Ex. 66. Shortly thereafter, Widdis and Stahl met in person but were unable to resolve their differences. G4i performed no further work on behalf of NANA following the meeting. Although no written termination of the Services Agreement was ever issued, NANA deems the Services Agreement terminated.

NANA thereafter declined to pay G4i's outstanding invoices and its monthly retainer. As a result, G4i has filed this civil action seeking $335,298.43 plus interest for breach of contract (Count I) on the grounds that G4i is entitled to its unpaid invoices and one percent of the gross revenue of defendant's contract with Raytheon or, in the alternative, for unjust enrichment (Count III). See Dkt. No. 96-1 (revised Proposed

Order).[2] Plaintiff also seeks an accounting "of all revenues that NANA has derived from G4i efforts." Compl. ¶ 40 (Count II).

## II. DISCUSSION

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the record in the light most favorable to the nonmoving party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). The moving party must initially show the absence of a genuine dispute of

---

[2] Defendant counterclaimed for breach of contract, alleging that "G4i billed NANA Services in excess of" $800,000 "but failed to bring in a single new relationship or contract to benefit NANA Services." Answer ¶ 61. Defendant contends that G4i breached its warranties and billed defendant for items not covered by any written contract. See Def.'s Br. at 8; Def.'s Reply at 20 (seeking to recover $116,000 for invoices paid to G4i). Plaintiff moved for summary judgment on the counterclaim, and defendant moved for partial summary judgment as to liability. At oral argument, the Court granted summary judgment to plaintiff on the grounds that no case law supported defendant's novel theory that the submission of an invoice not provided for under a contract constituted an independent act of breach of contract by G4i. Additionally, defendant produced no evidence creating a material dispute over its breach of warranty allegation. The only issues now remaining therefore are the parties' cross-motions for summary judgment on plaintiff's claims.

material fact, and once it has met its burden, the nonmovant "must come forward and show that a genuine dispute exists." Arrington v. ER Williams, Inc., No. 1:11cv535, 2011 U.S. Dist. LEXIS 144909, at *11-12 (E.D. Va. Dec. 16, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment is appropriate. Matsushita, 475 U.S. at 587.

Under the choice of law provision in the Services Agreement, Alaska law governs the claims for breach of contract. See Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007)("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances . . . .")(citing Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999)). Because the rule of lex loci delicti, or the law of the place of the wrong,

applies to choice-of-law decisions in tort actions, and the site of the alleged wrong in this instance was the Commonwealth, Virginia law governs the unjust enrichment claim and the action for accounting. See Colgan Air, Inc., 507 F.3d at 275 (citing Milton v. IIT Research Inst., 138 F.3d 519, 522 (4th Cir. 1998)).

## B. Breach of Contract

Plaintiff alleges that defendant breached the Services Agreement and the Raytheon Sales Agreement by refusing to pay one percent of the gross revenues received by NANA from Raytheon and various invoices G4i submitted for its work. To assert a claim for breach of contract under Alaska law, a plaintiff must allege: (1) existence of a contract; (2) breach; (3) causation; and (4) damages. Nicdao v. Chase Home Fin., No. 3:10-cv-00192-TMB, 2012 WL 882550, at * 8 (D. Alaska Mar. 13, 2012) (citing Great W. Sav. Bank v. George W. Easley Co., 778 P.2d 569, 577-78 (Alaska 1989)).

### 1. Plaintiff's Claim for One Percent of Gross Revenues

The Services Agreement and the Raytheon Sales Agreement are the only contracts at issue in this litigation. The Services Agreement awards one percent of gross revenues for the base contract and any option years under the following circumstances:

Should [NANA] receive any contract award as a result of a Bid or Proposal where G4i and [NANA] have jointly

10

> executed a Sales Referral Agreement . . . and G4i
> assisted in any form to help [NANA] receive the
> contract award, [NANA] shall pay G4i . . . an amount
> equal to one percent (1.0%) of the gross dollar amount
> paid to [NANA] over the term of the awarded contract
> including all option years if any. . . . This payment
> obligation shall continue and survive the date of
> termination for a period of time set forth on each
> applicable Sales Referral Agreement, without regard to
> the cause of termination.

See Pl.'s Br., Ex. 8 ¶ 3.2. Meanwhile, the Raytheon Sales

Agreement provides that:

> [NANA] shall pay G4i one percent (1.0%) of all gross
> receipts received by [NANA] as a result of a contract
> obtained by [NANA] due to the efforts of G4i in
> relation to the Engagement specified above. This
> payment obligation shall continue for the duration of
> the awarded contract including all option periods.

See Pl.'s Br., Ex. 12 at 1. The Sales Referral Agreement "is

subject to all other terms and conditions specified in the

Services Agreement" but "[i]f there is a conflict" between the

two contracts, "the Sales Referral Agreement shall take

precedence." Id.

NANA argues that a conflict exists between the above-quoted

one percent provisions and that the Raytheon Sales Agreement

therefore controls. According to defendant, the language

"obtained . . . due to the efforts of G4i" constitutes a

causation requirement in the Raytheon Sales Agreement. Defendant

then argues that because the Polar contract between Raytheon and

11

NANA was not "obtained by [NANA] due to the efforts of G4i," G4i is not entitled to the one percent.

Assuming arguendo that the provisions are in conflict, even under the Raytheon Sales Agreement, G4i is entitled to the one percent fee. NANA supports its causation argument by focusing on only a portion of the Raytheon Sales Agreement, but contracts must be read as a whole. See, e.g., Weiner v. Burr, Pease & Kurtz, P.C., 221 P.3d 1, 9 (Alaska 2009); Restatement (Second) of Contracts § 202(2). The scope of work described in the Raytheon Sales Agreement makes clear that G4i was retained to "assist [NANA] by creating the proposal response to the specified RFI, including the completion of the cost section of the proposal." Pl.'s Ex. 12 at 1 (emphasis added). Following this specific statement of work, the Raytheon Sales Agreement adds the payment language relied on by defendant for its causation argument: "as a result of a contract obtained . . . due to the efforts of G4i"; however, that sentence also includes the modifier, "in relation to the Engagement specified above." Id. (emphasis added). The "in relation" language clearly refers back to the scope of work, which states that G4i was retained to assist NANA in responding to the RFP.

It is undisputed that G4i assisted NANA in responding to the RFP and that NANA received the contract. NANA has pointed to

12

no evidence showing that G4i did not assist it in getting the contract, and G4i is therefore entitled to one percent of the gross revenues from the contract.

This interpretation of the contract is consistent with the evidence of the parties' intent and their course of conduct. For example, Cammack testified that because the monthly retainer in the Services Agreement and G4i's hourly billing under the Sales Referral Agreement would not result in a profit for G4i, the one percent fee provision provided the business incentive for G4i to enter into the contract with NANA. See Pl.'s Br. at 6. Regardless of whether Cammack's assessment of G4i's business model is accurate, his testimony is the sole evidence regarding the parties' intent at the time of contracting and supports the conclusion that they intended that G4i receive the one percent fee. NANA tries to avoid this conclusion by arguing that plaintiff's work was "ministerial" and sometimes frustrating and that the contract was awarded in spite of G4i's work, not "as a result" of it. This characterization of the value of G4i's work is contradicted by NANA's course of conduct, which was to involve G4i in each stage of the Raytheon bid without lodging any contemporaneous complaints with G4i about its work or billing, and to execute eleven more Sales Referral Agreements with plaintiff.

13

NANA's additional argument that G4i is not entitled to the one percent fee because Raytheon initiated the process with a "sole-source solicitation" is also unavailing. Although defendant had worked with Raytheon for the previous six years, evidenced by the performance history listed in the Raytheon Polar contract itself, and although the bid request was issued to NANA alone, Raytheon's ultimate decision to award the contract to NANA was not guaranteed. Importantly, NANA executed the Raytheon Sales Agreement with G4i despite its pre-existing relationship with Raytheon and its knowledge that the bid request was sole-source. NANA presumably anticipated value in G4i's assistance with the RFP process and, regardless of whether that was the correct business decision, NANA must now abide by the terms of the contract, including paying one percent of the gross revenue to plaintiff.[3]

---

[3] Defendant also argues that the language of the Services Agreement is unenforceable due to public policy, yet it cites no case law to support its position that a percentage of gross revenue constitutes an "unreasonable fee" that courts decline to enforce. It relies on two cases for the uncontroversial principle that contracts that violate public policy are unenforceable; however, Long v. Holland Am. Line Westours, Inc., 26 P.3d 430 (Alaska 2001), involved contracts of adhesion in which one party had no meaningful bargaining power and was surprised by a last-minute disclosure. Similarly unhelpful is Pavone v. Pavone, 860 P.2d 1228 (Alaska 1993), which held that a contract formed to circumvent a clear Alaska statute was unenforceable. Neither case supports defendant's position that this fee arrangement between two sophisticated commercial entities is void for public policy.

Having found that the provisions of the Raytheon Sales
Agreement entitle plaintiff to recover one percent of the
contract revenues, the extent to which the one percent provision
applies must be determined. The parties dispute whether the
Raytheon contract at issue is one contract, as G4i asserts, or
two distinct contracts, as NANA contends. If NANA is correct,
G4i is entitled only to the revenues from what NANA categorizes
as the "Staffing" contract, but not the "Management" contract,
which it maintains predates its relationship with G4i; G4i, on
the other hand, describes NANA's differentiation as "artificial"
and argues that the Raytheon Polar contract, for which G4i
assisted in bidding, encompassed management and staffing. G4i
correctly argues that the scope of the Raytheon Polar contract,
not NANA's bookkeeping practices, is dispositive.

In addition to the critical fact that NANA bid on the work

---

NANA also argues that compensation of a consultant based on
a percentage of revenue is now "illegal" pursuant to 13 C.F.R.
§ 124.4, the title that governs the Small Business
Administration. NANA's argument is flawed in several respects.
Even if a federal regulation governing enforcement of SBA
programs was persuasive or somehow binding on a federal court
sitting in diversity and applying Alaska law to a private
contract dispute, the regulation would not retroactively apply
to a contract executed five years before it was promulgated. See
76 Fed. Reg. 8228 (Feb. 11, 2011)(disclaiming retroactive
application of any of the newly promulgated regulations under
Title 13). Although defendant argues that the regulation
codifies the traditional common law rule that gross receipt
provisions are contrary to public policy, as already noted, it
offers no Alaska case law as support.

in one proposal and signed one contract with Raytheon in April 2007, the Raytheon Polar contract itself bundled the annual revenues into a single compensation number. The significant increase shown in the "funding commitments" section of the contract, with $956,303.16 in payments to NANA in 2006-2007 for only management services rising to $3,412,843 in 2007-2008 for management and staffing, supports the conclusion that the RFP was for one contract that greatly increased the scope of NANA's work and its commensurate responsibilities. See Pl.'s Br., Ex. 34. Under the Raytheon Sales Agreement, G4i is entitled to one percent of the gross revenues for the Raytheon Polar contract, which included both management and staffing work.

Defendant also challenges plaintiff's claim to revenues NANA received from Raytheon for work from April 1, 2011 through March 31, 2012. In the contract between Raytheon and NANA that G4i assisted in securing, the ensuing years of performance were labeled "option years." See Pl.'s Br., Ex. 34 at 3. The performance under that contract began April 1, 2007 with the final "option year" ending on September 30, 2010. Id. The contract also provided for one further extension, labeled "Extension Option 1," which ran from October 1, 2010 through March 31, 2011. Id. G4i is entitled to one percent of the revenues for this period because NANA's "payment obligation"

exists "for the duration of the awarded contract including all option periods." See Pl.'s Br., Ex. 12.

On June 30, 2011, Raytheon and NANA executed a separate agreement. See Pl.'s Br., Ex. 36; Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") at 9-10. The contract signed in June 2011 has a different contract number and reads as a stand-alone contract. The previous contract identified the possible option years, which did not include the 2011-2012 year. See Pl.'s Br., Ex. 34. Although the 2011-2012 work was related to the same prime contract with the NSF, NANA has introduced sworn testimony stating that the 2011-2012 contract resulted from a new bid and that the scope of work, while similar, did change. Def.'s Opp'n, Ex. 8 (Tracey Ramsey Dep.). Plaintiff's evidence does not create a material dispute as to whether the final year of NANA-Raytheon work was an option year covered by the Raytheon Sales Agreement.

For the above-stated reasons, the Court will grant plaintiff's motion for summary judgment on the issue of its entitlement to one percent of revenue received by NANA from the Raytheon Polar contract between April 1, 2007 and March 31, 2011 and will deny plaintiff's motion as to the revenue received between April 1, 2011 through March 31, 2012.

## 2. Plaintiff's Claim for Unpaid Invoices

Plaintiff also claims breach of contract due to NANA's

17

failure to pay $85,842.59 in outstanding invoices. The parties

each seek summary judgment as to the unpaid invoices, with

defendant arguing that plaintiff lacked authorization to incur

these costs, many of which should have been included in the

retainer, and that hourly billing was not permitted under the

Services Agreement. Plaintiff contends that the reference in the

Services Agreement to "normal day rates" meant hourly billing:

> G4i shall provide its Bid and Proposal assistance to
> [NANA] for mutually agreeable bids for small
> subcontractor opportunities to be pursued by [NANA].
> For all other Bid and Proposal opportunities where
> [NANA] desires to use G4i Bid and Proposal services,
> [NANA] will pay G4i its normal day rates for services
> provided.

See Services Agreement ¶ 3.7. Plaintiff does not explain why the

language "normal day rates" should be interpreted to mean hourly

billing when the Raytheon Sales Agreement, executed the same

day, used different language to explicitly permit hourly

billing. See Pl.'s Br., Ex. 12 (specifying that G4i is entitled

to a "fee of $125 per hour"). Defendant, meanwhile, disputes

that the provision above allows hourly billing but does not

offer another definition for "normal day rates."

Plaintiff seeks to recover for nine unpaid service

invoices, which it calculates as representing 77 billing items.

See Pl.'s Br., Exs. 70-1 through 70-5, 70-7 through 70-8, 70-10

through 70-11 (invoice nos. 389-393, 415-416, 434-435).

Plaintiff argues that each invoice was for appropriate services and fees under either the Services Agreement, with its provision for a "normal day rate," or by one of the Sales Referral Agreements. Plaintiff maintains that the items billed under the Services Agreement represent work that exceeded the limited scope of the monthly retainer but were not developed to the point to warrant a new Sales Referral Agreement. Additionally, plaintiff argues that, given that NANA paid all submitted invoices for a year and a half without protest, the parties' course of conduct shows that both sides understood that hourly billing was permissible under the Services Agreement. Evidence of course of conduct is relevant to determining whether the parties contracted for hourly billing. See, e.g., Alaska Statebank v. Fairco, 674 P.2d 288, 292 (Alaska 1983)(finding that parties' course of dealing induced reasonable reliance and became part of the contract); Restatement (Second) of Contracts § 223. NANA, at this point, has made no showing that G4i invoiced NANA for items that Cammack never approved. Nevertheless, there is a material dispute as to whether the Services Agreement authorized hourly billing and what the course of conduct between the parties was. Additionally, defendant alleges that plaintiff exceeded the $15,000 cap in the Raytheon Sales Agreement; if plaintiff was commonly exceeding contractual

caps, it may not be entitled to payment for certain invoices under the Sales Referral Agreements. Accordingly, the services invoices must be resolved at the bench trial.[4]

Plaintiff also seeks to recover over $9,000 for a January 2008 networking conference organized by G4i and sponsored, in part, by NANA. See Pl.'s Br., Ex. 70-9 (invoice no. 417). The invoice includes line items for "reception sponsor," "marketing list," copies and magazine holders. Id. G4i points to emails demonstrating that NANA agreed to be a sponsor, see Pl.'s Br., Exs. 72-74, and it claims that this event fell under the auspices of the Services Agreement because it was designed to introduce NANA to potential partners and foster potential contractual relationships, see Pl.'s Br. at 25 (citing Ex. 8 ¶ 1.1). NANA argues that G4i billed over $70,000 for what was to be a $10,000 event. See Def.'s Reply at 16-17. It also complains that the event benefitted G4i, not NANA. Because there are material disputed facts about the nature of the conference—specifically, whether the actual event was designed as promised and what expenses were authorized—summary judgment will not be granted as to this invoice.

Finally, G4i seeks to recover $33,000 for unpaid monthly

---

[4] The Court will grant summary judgment for defendant as to the four line items, representing a total of $3,000, incurred for work performed after G4i received Cammack's stop work email. See Pl.'s Br., Ex. 70-8 (Invoice No. 416).

retainers. See Pl.'s Br., Exs. 70-6, 70-12 (invoice nos. 413, 463). Although the February 19, 2008 stand-down email did not explicitly comply with the Services Agreement's provision concerning contract termination, there is an open question of whether NANA remained obligated to pay further monthly retainers. Plaintiff claims not only that it is entitled to its monthly retainer but also that it is entitled to a $2,000 per month increase from April 2008 through the expiration of the contract in August 2008. Plaintiff argues that the increase, to a total of $7,000 per month, was authorized by Cammack but points to no written modification of the retainer provision. See Pl.'s Br., Ex. 70-12 (invoice no. 463).[5]

With the exception of the invoice for post-February 19, 2008 work, the cross-motions for summary judgment will be denied as to the invoices, which are fraught with disputed material facts. The parties must be prepared at the upcoming bench trial to defend their positions in detail with respect to each individual item on each invoice and explain exactly what authorization existed for plaintiff to engage in the activities

---

[5] Should damages be awarded to plaintiff, G4i also seeks prejudgment interest calculated pursuant to Alaska Stat. § 09.30.070 at 7%. See Pl.'s Br. Ex 1 (Stahl Aff.); Exs. 70-13 – 70-18 (interest invoices).

for which it billed defendant.[6]

## C. Accounting

Each party contends that it is entitled to summary judgment on G4i's claim for an accounting. Although the Services Agreement provides for an accounting by a third party accounting firm, see Pl.'s Br., Ex. 1 ¶ 3.5; Pl.'s Br., Ex. 4 at 36:5-10 (Javes Dep.), defendant correctly argues that the discovery process has resulted in the production of all of NANA's relevant financial documents. This discovery renders plaintiff's request for an accounting unreasonable; however, because the Services Agreement explicitly provides for an accounting, plaintiff may insist on one but will have to pay all costs involved. Accordingly, summary judgment will be granted to plaintiff on this issue.

### III.  CONCLUSION

For the above-stated reasons, the parties' motions for

---

[6] As an alternative theory of recovery, plaintiff alleges unjust enrichment, for which it must show that (1) it conferred a benefit on defendant; (2) defendant knew of the benefit and should reasonably have expected to pay plaintiff; and (3) defendant accepted or retained the benefit without paying its value. Schmidt v. Household Fin. Corp., 276 Va. 108, 116 (2008). Because written contracts underlie the parties' performance, and the sloppy practices by the parties undercuts any basis to award equitable relief, plaintiff's motion for summary judgment as to Count III will be denied, and the claim will be dismissed by the Order accompanying this Opinion.

summary judgment will be granted in part and denied in part by

an Order to be issued with this Memorandum Opinion.

    Entered this $\underline{14}^{th}$ day of May, 2012.

Alexandria, Virginia

                                     /s/

                              Leonie M. Brinkema
                              United States District Judge